

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:24-cr-**42** |
| | ) | |
| v. | ) | 26 U.S.C. § 7201 |
| | ) | Evasion of Income Tax Assessments |
| THEODORE NICHOLAS | ) | (Counts 1 and 2) |
| PAPOULOGLOU | ) | |
| a/k/a "NICK PAPOULOGLOU" | ) | 18 U.S.C. § 371 |
| a/k/a "NICK EMPORIA," | ) | Conspiracy to Transfer, Receive, |
| | ) | Conceal, and Sell Stolen Goods |
| *Defendant.* | ) | (Count 3) |
| | ) | |
| | ) | 18 U.S.C. §§ 1960(a), 1960(b)(1)(A), |
| | ) | & 1960(b)(1)(B) |
| | ) | Operating an Unlicensed Money |
| | ) | Transmitting Business |
| | ) | (Count 4) |
| | ) | |
| | ) | Forfeiture Allegation |
| | ) | |

## INDICTMENT

March 2024 Term - At Richmond, Virginia

THE GRAND JURY CHARGES THAT:

## INTRODUCTION

At all times relevant and material to this Indictment, unless otherwise stated:

1.     THEODORE NICHOLAS PAPOULOGLOU, a/k/a "NICK PAPOULOGLOU" a/k/a "NICK EMPORIA," the defendant herein, was a resident of Roanoke Rapids, North Carolina.

2.     On or about November 6, 2020, PAPOULOGLOU incorporated DG Auto South LLC ("DG Auto South") with the Virginia State Corporation Commission. DG Auto South is a limited liability company located in Emporia, Virginia, within the Eastern District of Virginia, that

operated as a scrap metal business. PAPOULOGLOU solely owned DG Auto South and ran the business' operations directly. DG Auto South routinely purchased and sold automotive parts, including catalytic converters. DG Auto South also operated as a money transmission business in connection with the purchase and sale of catalytic converters.

3. On or about November 12, 2019, PAPOULOGLOU incorporated Strategic Converter & Cores LLC ("Strategic Converter") with the North Carolina Secretary of State. Strategic Converter is a limited liability company registered to PAPOULOGLOU's mother's address in Gaston, North Carolina. Strategic Converter functioned as an alter ego of PAPOULOGLOU. DG Auto South and Strategic Converter are collectively referred to as the "Catalytic Converter Businesses."

4. CO-CONSPIRATOR ("CC")-1 was a New Jersey resident. CC-1 was the owner and operator of COMPANY A, a catalytic converter bulk buying business located in Freehold, New Jersey, and an affiliate business to the Catalytic Converter Businesses. COMPANY A maintained an online software application that allowed catalytic converter buyers to price catalytic converters ("COMPANY A App") based upon what COMPANY A would pay for a particular catalytic converter (*e.g.*, originating from a 2013 Toyota Prius) in various locations. PAPOULOGLOU used the COMPANY A App to price catalytic converters he purchased for DG Auto South.

5. CC-2 was a business associate of PAPOULOGLOU's who worked in the DG Auto South location in Emporia, Virginia.

6. CC-3 and CC-4 were Texas residents who bought stolen catalytic converters. CC-3 and CC-4 then resold stolen catalytic converters to CC-1.

2

7.     CC-5 was an Oklahoma resident who bought stolen catalytic converters. CC-5 then resold stolen catalytic converters to CC-1.

8.     The Internal Revenue Service ("IRS") was an agency within the Department of the Treasury responsible for administering and enforcing the tax laws of the United States and collecting taxes owed to the Treasury of the United States by its citizens and other entities.

9.     Under federal law, any person who owned or controlled a money transmitting business was required to register that business with the Department of Treasury.

10.    Similarly, pursuant to the Code of Virginia, Sections 6.2-1921 and 6.2-1901, the operation of a business engaging in unlicensed money transmission without having acquired a license from the Commonwealth of Virginia was a prohibited act, punishable as a misdemeanor.

11.    Neither PAPOULOGLOU nor the Catalytic Converter Businesses were registered as money transmitting businesses – either with the Department of Treasury or with the Commonwealth of Virginia.

12.    PAPOULOGLOU paid for an active subscription with Garda Technical Services, a bulk cash delivery service.

### A. Background on the Purchase of Catalytic Converters

13.    A catalytic converter is an exhaust emission control device that reduces the amount of toxic gas produced by motor vehicles. Catalytic converters have been mandated for all cars and trucks since 1975. Catalytic converters are located underneath the vehicle near the engine exhaust manifold. Catalytic converters contain valuable metals like platinum, palladium, and rhodium. Some of these precious metals are more valuable per ounce than gold, and their value has been increasing in recent years. The black-market price for catalytic converters can be above $1,000 each, depending on the type of vehicle with which the catalytic converter is compatible. Used

catalytic converters are frequently taken to scrap metal businesses, where the valuable metals are removed and resold.

14.     Catalytic converters are an easy mark for thieves, in part, because they can be cut from a vehicle in a short amount of time (often less than a minute) with just a battery powered reciprocating saw, often without the need to put the vehicle on jacks. Once a catalytic converter is detached from its originating vehicle, it is difficult to trace, because catalytic converters are generally not marked with information sufficient to identify the originating vehicle. Removal of the catalytic converter often renders the vehicle undrivable.

### B.   *The Commonwealth of Virginia required reporting of catalytic converter sales.*

15.     From in or about at least 2014, and continuing through July 1, 2022, Section 59.1-136.3(B) of the Virginia Code has required purchasers of catalytic converters from individuals who are not affiliated with a licensed scrap seller to either: (1) receive documentation from the person selling the catalytic converter establishing the person's lawful possession of the catalytic converter (*e.g.*, bill of sale, receipt, letter of authorization, or similar evidence); or (2) document a "diligent inquiry" into whether the seller of the catalytic converter had a legal right to do so and submit to local law enforcement a report describing the catalytic converter with the seller's identifying information.

16.     In response to rising catalytic converter thefts, Virginia passed a law taking effect on July 1, 2022, which tightened the requirements on scrap metal purchasers of catalytic converters. Pursuant to Section 59.1-136.3(E) of the Virginia Code, which went into effect on July 1, 2022, scrap metal purchasers of catalytic converters from individuals who are not affiliated with a licensed scrap seller must: (1) receive documentation from the seller of the catalytic converter establishing the seller's lawful possession of the catalytic converter (*e.g.*, bill of sale, receipt, letter

of authorization, or similar evidence); (2) document a "diligent inquiry" into whether the seller of the catalytic converter had a legal right to do so and submit to local law enforcement a report describing the catalytic converter with the seller's identifying information; **and** (3) maintain all such documentation for at least 2 years after purchase, to be made available to law enforcement if requested.

17.     To comply with the statutory requirements to submit to local law enforcement a report describing the catalytic converter (complete with the seller's identifying information), scrap metal purchasers in the greater Richmond, Virginia area made entries associated with each sale into a database maintained by LeadsOnline LLC. Such entries – submitted to LeadsOnline LLC either directly or via submittals of information through local law enforcement – documented, for each catalytic converter sale, the name of the seller, transaction date, and purchase price, among other information.

### COUNT ONE
(Evasion of 2021 Income Tax Assessment)

18.     The factual allegations contained in the Introduction are re-alleged and incorporated as if set forth herein in their entirety.

### A. *PAPOULOGLOU received 2021 gross receipts and income.*

19.     In 2021, Strategic Converter received gross receipts, including proceeds from the illicit sale of catalytic converters to COMPANY A, amounting to at least $10,429,637. COMPANY A sent this money to the Strategic Converter BB&T Bank (last four digits 0930) (the "BB&T-0930 Account") via wire transfers from COMPANY A's bank accounts.

20.     In 2021, DG Auto South received gross receipts, including proceeds from the illicit sale of catalytic converters to COMPANY A, amounting to at least $4,047,000. COMPANY A

sent money via wire transfers to the DG Auto South BB&T Bank account (last four digits 9445) (the "BB&T-9445 Account"). PAPOULOGLOU is the sole member listed on the account and had signature authority over the BB&T-9445 Account. DG Auto South employees A.T. and M.T. also had signature authority over the BB&T-9445 Account.

21.     The aforementioned gross receipts from the Catalytic Converter Businesses resulted in the generation of at least $568,306 in income to PAPOULOGLOU.

**B.  *PAPOULOGLOU made personal expenditures with Catalytic Converter Business funds.***

22.     PAPOULOGLOU used the aforementioned wired funds from COMPANY A to make at least the following purchases for his personal benefit:

    a.  On or about February 21, 2021, PAPOULOGLOU purchased a real estate property in Roanoke Rapids, North Carolina for a total amount of $190,000 with funds drawn from the BB&T-0930 Account. The property was titled in PAPOULOGLOU's name, and PAPOULOGLOU thereafter lived at the property.

    b.  Between on or about June 4, 2021, and continuing through on or about November 8, 2021, PAPOULOGLOU used Catalytic Converter Business funds to gamble at the Aria and Bellagio Casinos in Las Vegas, Nevada and at the MGM National Harbor Casino in Oxon Hill, Maryland.

    c.  On or about June 18, 2021, PAPOULOGLOU wired approximately $32,000 from the BB&T-0930 Account to a third party in Wake Forest, North Carolina for a personal expense: The purchase of a recreational land plot by Lake Gaston in North Carolina.

6

    d.  On or about July 16, 2021, PAPOULOGLOU wired approximately $28,493 from the BB&T-0930 Account to a vendor to purchase a luxury motorcycle for his girlfriend, D.P.

    e.  On or about August 18, 2021, PAPOULOGLOU purchased a real estate property in Roanoke Rapids, North Carolina with a $137,816 cashier's check from the BB&T-9445 Account. Although the property was titled in the name of DG Auto South, PAPOULOGLOU purchased the property to generate personal rental income for his own benefit.

23.    The approximate tax due and owing resulting from PAPOULOGLOU's evasion of income tax assessment for 2021 is at least $169,059.

### C. Affirmative Acts of Evasion in 2021

24.    PAPOULOGLOU failed to file a 2021 IRS Form 1040 tax return, despite knowing of his obligation to file an individual income tax return.

25.    PAPOULOGLOU dealt extensively in cash, including paying his customers and employees in cash, to conceal and obfuscate his income and expenses.

26.    PAPOULOGLOU used nominee entities – i.e., the Catalytic Converter Businesses – and transferred funds between and among the Catalytic Converter Businesses' bank accounts to conceal and obfuscate his income and expenses.

27.    PAPOULOGLOU made extensive purchases for his own personal benefit from the Catalytic Converter Businesses' bank accounts while failing to report to the IRS the associated income.

28.    PAPOULOGLOU maintained a double set of accounting records for his businesses in order to fraudulently reduce his tax liability: (1) one set reflecting only payroll costs of $500 per

employee per week in wages; and (2) another set reflecting the remainder of cash wages paid to employees beyond $500 per week. On or about April 16, 2021, PAPOULOGLOU started using a payroll processor to make withholdings and file IRS Forms 941 (Employer's Quarterly Federal Tax Returns). For the quarters ending in June of 2021 and September of 2021, as PAPOULOGLOU knew and intended, the payroll processor withheld employee taxes and filed IRS Forms 941 based only on the accounting records that reflected a total of $500 weekly wages paid to each employee. PAPOULOGLOU's material omissions of the true balance of employee wages to the payroll processor caused the payroll processor to underreport wages and withholdings of DG Auto South's employees to the IRS and to underpay taxes due.

29.     PAPOULOGLOU instructed his accountant, who was based in the Eastern District of Virginia, to create another nominee entity, 301 Auto Parts LLC, so that PAPOULOGLOU could further conceal and obfuscate his income and expenses.

### D. Statutory Language

30.     During the calendar year 2021, within the Eastern District of Virginia and elsewhere, THEODORE NICHOLAS PAPOULOGLOU, a/k/a "NICK PAPOULOGLOU," a/k/a "NICK EMPORIA," the defendant herein, did willfully attempt to evade and defeat the assessment of substantial individual income taxes due and owing by him to the United States for the calendar year 2021, by committing and causing to be committed the affirmative acts of evasion listed in Paragraphs 24-29 above, among others.

(In violation of Title 26, United States Code, Section 7201.)

8

## COUNT TWO
(Evasion of 2020 Income Tax Assessment)

31.     The factual allegations contained in the Introduction are re-alleged and incorporated as if set forth herein in their entirety.

32.     In 2020, Strategic Converter received gross receipts, including the proceeds from the illicit sale of catalytic converters to COMPANY A, amounting to at least $1,795,431. COMPANY A paid Strategic Converter via wire transfers from COMPANY A's bank accounts the BB&T-0930 Account. PAPOULOGLOU was the sole owner and signatory on the BB&T-0930 Account.

33.     These gross receipts resulted in the generation of income to PAPOULOGLOU.

### A. *PAPOULOGLOU underreported income and manufactured a $0 taxable income figure.*

34.     On or about May 12, 2021, PAPOULOGLOU filed and caused to be filed with the IRS an individual income tax return (Form 1040) for tax year 2020. The Schedule C accompanying this Form 1040 reported DG Auto South as having gross receipts of $262,605 and total expenses in the amount of $273,672, resulting in a net loss to DG Auto South of $11,067. Concurrently, the Form 1040 underreported Strategic Converter's gross receipts as being only $157,187, with total expenses in the amount of $146,120, resulting in a net profit of $11,067. However, as PAPOULOGLOU then and there well knew, the gross receipts figure he reported for Strategic Converter was false, as the business had at least $1,795,431 in gross receipts.

35.     By concealing the true gross receipts for Strategic Converter and by manipulating the net profit and net loss figures for the Catalytic Converter Businesses to offset, PAPOULOGLOU was able to fraudulently report $0 in taxable income on his Schedule C. This

ultimately caused PAPOULOGLOU to receive a $1,800 tax refund when, in fact, PAPOULOGLOU owed taxes to the IRS.

36.     The approximate tax due and owing resulting from PAPOULOGLOU's evasion of income tax assessment for 2020 was at least $296,266.

### B. Affirmative Acts of Evasion in 2020

37.     On or about May 12, 2021, PAPOULOGLOU did prepare (and cause to be prepared), sign, and file (and caused to be filed) with the IRS a false and fraudulent 2020 U.S. Individual Income Tax Return, IRS Form 1040, that substantially understated his total income and tax due and owing for tax year 2020. PAPOULOGLOU substantially understated the gross receipts to Strategic Converter, resulting in PAPOULOGLOU reporting a fraudulently decreased income; in fact, PAPOULOGLOU reported having received no taxable income and no tax due in tax year 2020, resulting in PAPOULOGLOU receiving a $1,800 tax refund for the year. In truth and fact, as he well knew, PAPOULOGLOU concealed gross receipts of at least $1,375,639 in order to fraudulently reduce his tax liability.

38.     PAPOULOGLOU used nominee entities – *i.e.*, the Catalytic Converter Businesses – to conceal his receipt of income.

39.     PAPOULOGLOU dealt extensively in cash, including paying his customers and employees in cash, to conceal and obfuscate his income and expenses.

40.     PAPOULOGLOU made incomplete statements and provided incomplete records to his return preparer, an accountant based in Emporia, Virginia, within the Eastern District of Virginia.

### C. *Statutory Language*

41.    During the calendar year 2020, within the Eastern District of Virginia and elsewhere, THEODORE NICHOLAS PAPOULOGLOU, a/k/a "NICK PAPOULOGLOU," a/k/a "NICK EMPORIA," the defendant herein, did willfully attempt to evade and defeat the assessment of substantial individual income taxes due and owing by him to the United States for the calendar year 2020, by committing and causing to be committed the affirmative acts of evasion listed in Paragraphs 37-40 above, among others.

(In violation of Title 26, United States Code, Section 7201.)

### COUNT THREE
(Conspiracy to Transfer, Receive, Conceal, and Sell Stolen Goods)

42.    The factual allegations contained in the Introduction are re-alleged and incorporated as if set forth herein in their entirety.

43.    Beginning on a date unknown, but at least as early as 2020, and continuing until at least in or about November 2, 2022, the exact dates being unknown, in the Eastern District of Virginia and elsewhere, THEODORE NICHOLAS PAPOULOGLOU, a/k/a "NICK PAPOULOGLOU," a/k/a "NICK EMPORIA," defendant herein, did knowingly and willfully conspire, confederate, and agree with others, known and unknown to the Grand Jury (collectively, the "Conspirators"), to commit certain offenses against the United States, that is, to violate: (1) Title 18, United States Code, Section 2315, by receiving, possessing, concealing, storing, bartering, selling, and disposing of any goods, wares, and merchandise (namely, catalytic converters) of the value of $5,000 or more, which have crossed a State boundary after being stolen, unlawfully converted, and taken, knowing the same to have been stolen, unlawfully converted, and taken; and (2) Title 18, United States Code, Section 2314, by transporting, transmitting, and

11

transferring in interstate commerce from Emporia, Virginia, within the Eastern District of Virginia, to locations outside of Virginia (including New Jersey and Japan), stolen goods, wares, and merchandise, that is, catalytic converters, of the value of $5,000 or more, knowing the same to have been stolen, converted, and taken by fraud.

### A.  The Purpose of the Conspiracy

44.    The purpose of the conspiracy was for the defendant and his co-conspirators to unlawfully enrich themselves from the possession, concealment, storing, bartering, and sale of catalytic converters known to: (1) have been stolen; (2) be valued at more than $5,000; and (3) have crossed a state boundary after being stolen.

45.    Another purpose of the conspiracy was for the defendant and his co-conspirators to unlawfully enrich themselves from the transfer of catalytic converters across state boundaries knowing that such catalytic converters: (1) had been stolen; and (2) were valued at more than $5,000.

46.    Another purpose of the conspiracy was for the defendant and his co-conspirators to conceal from governmental authorities their illicit sale, receipt, and transportation across state boundaries of stolen catalytic converters.

### B.  Manner and Means of the Conspiracy

47.    It was part of the conspiracy that the defendant held his business, DG Auto South LLC, to be involved in the business of buying catalytic converters, advertising on Facebook that he was "Looking large volume customer's that can bring volume the larger the load the better the pay."

48.     The defendant and co-conspirators received stolen catalytic converters in Emporia, Virginia, within the Eastern District of Virginia, from thieves, who stole catalytic converters from personal vehicles outside of Virginia.

49.     It was further part of the conspiracy that the defendant would routinely apply a discount to the purchase price for catalytic converters from thieves when he knew such catalytic converters were stolen.  Often times, this discount was up to 20% of the price quoted on the COMPANY A App.

50.     It was further part of the conspiracy that the defendant would conceal the purchase of these stolen catalytic converters by failing to report these purchases to LeadsOnline LLC and/or local law enforcement as required under Virginia law.  The defendant did report certain other transactions for catalytic converters to LeadsOnline LLC.

51.     It was further part of the conspiracy that the defendant, after purchasing stolen catalytic converters, would resell the catalytic converters to CC-1, COMPANY A, and other bulk catalytic converter resellers. Specifically, the defendant would: (1) load and cause to be loaded the stolen catalytic converters into a truck; and (2) transport and cause to be transported the catalytic converters to bulk catalytic converter resellers (including COMPANY A, based in Freehold, New Jersey), for ultimate shipment of the catalytic converter metals to Japan. In exchange, the bulk catalytic converter resellers (including COMPANY A) would send money to PAPOULOGLOU.

*C. Overt Acts*

52.     In furtherance of the conspiracy, the defendant and his co-conspirators committed, in the Eastern District of Virginia and elsewhere, one or more of the following acts:

53.     On August 10, 2022, in a recorded conversation among Confidential Informant-1, PAPOULOGLOU, and CC-2, Confidential Informant-1 stated that his associate had stolen

catalytic converters for sale. Confidential Informant-1's associate was, in truth, an undercover law enforcement agent (hereinafter, "Undercover Agent-1"). Confidential Informant-1 represented that Undercover Agent-1 was an out-of-town trucker who had been selling stolen catalytic converters to another buyer, and that this other buyer was reducing the sale price by 25% because the catalytic converters were stolen. PAPOULOGLOU represented that such a reduction was reasonable because the buyer was "taking a gamble." PAPOULOGLOU and CC-2 both asked Confidential Informant-1 to find when these catalytic converters could be ready for sale. PAPOULOGLOU said, "When he wants to sell them?" CC-2 added, "That way, we could get our bread [money] together. . . Find out when he gonna come."

54.    On August 24, 2022, while selling PAPOULOGLOU and CC-2 catalytic converters, Confidential Informant-1 stated that another buyer had reduced the purchase price because the sold catalytic converters were stolen: "You already know the joint stolen and stuff like that, he cut like 25% off you know what I'm saying." In the same conversation, PAPOULOGLOU asked Confidential Informant-1 when Undercover Agent-1 could come to sell the catalytic converters. PAPOULOGLOU told Confidential Informant-1 that he would discount the purchase price by 25% on the COMPANY A App: "I take mine off on the [COMPANY A] app," and then stated, "Take 25%." Confidential Informant-1 related that a separate catalytic converter purchaser in North Carolina discounted the price by 50% because the catalytic converters were stolen. PAPOULOGLOU responded, "Nah, if you got a cat worth $2,000, I might take an extra $50 off, but I'm not going to hit somebody that hard." Confidential Informant-1 related that a separate buyer took 25% off because the catalytic converters were "hot." PAPOULOGLOU stated, "That ain't bad." PAPOULOGLOU confirmed that he would "cut back" the price shown on the

14

COMPANY A app by 25% for the forthcoming purchase by PAPOULOGLOU of Undercover Agent-1's (purportedly) stolen catalytic converters.

55.     On or about August 29, 2022, Confidential Informant-1 made a recorded phone call to PAPOULOGLOU, who answered the call and confirmed a meeting on August 30, 2022 for Confidential Informant-1 and Undercover Agent-1 to sell PAPOULOGLOU catalytic converters. PAPOULOGLOU confirmed, "Meet me at the shop."

56.     On August 30, 2022, Confidential Informant-1 and Undercover Agent-1 took catalytic converters (which had in fact been provided by law enforcement) to PAPOULOGLOU in Emporia, Virginia in a U-Haul van with Arizona license plate tag number ending in -8106. Upon their arrival at PAPOULOGLOU's location, CC-2 climbed into the back of the U-Haul van with the catalytic converters and asked PAPOULOGLOU, "Do you want me to throw them on the ground or throw them in the box," to which PAPOULOGLOU replied, "It don't matter to me. . . Just put it over there for now." Thereafter, CC-2 removed the catalytic converters from Undercover Agent-1's van and moved the converters to the Catalytic Converter Business shop floor after reading off part numbers associated with each catalytic converter. At numerous points during this exchange PAPOULOGLOU asked CC-2 for clarification on the parts numbers associated with the catalytic converters. PAPOULOGLOU entered each part number into the COMPANY A App, showed the COMPANY A App price readout to Undercover Agent-1, verbally stated the price for that catalytic converter, and recorded the price on an electronic device.

57.     In this same conversation on August 30, 2022, PAPOULOGLOU clarified that the "25%" (*i.e.,* the purchase price cut factoring in the stolen nature of the catalytic converter) was set directly through the price output from the COMPANY A App, stating, "I can set my app the way I want it."  CC-2 reiterated, "It's already in the app." Undercover Agent-1 told PAPOULOGLOU

and CC-2: "Man, you told me you were fair, man. That's, that's the problem man, once once folks find out they hot, man, they, they wanna try to. . ." PAPOULOGLOU replied, "Dude I was up, last year I was buying 3 to 4 thousand here a week."

58.     On or about August 30, 2022, PAPOULOGLOU paid Undercover Agent-1 $16,130 in cash for the catalytic converters, which PAPOULOGLOU understood to have been stolen.

59.     Thereafter, PAPOOULOGLOU and his co-conspirators transported these purportedly stolen catalytic converters across state lines. On or about August 30, 2022, in the same conversation, Undercover Agent-1 inquired, "What do you do when you break them down," to which PAPOULOGLOU replied, "They get shipped to Japan."

60.     PAPOULOGLOU and his co-conspirators (including CC-2) deliberately failed to record these transactions with LeadsOnline LLC, as required by Virginia law.

61.     At various times, PAPOULOGLOU took actions to entice and reward catalytic converter sellers to patronize his business, including by arranging prostitution services for visiting catalytic converter sellers from outside of Virginia who traveled to Emporia, Virginia to sell catalytic converters to PAPOULOGLOU and by arranging their lodging.

62.     Across 2020 and 2021, PAPOULOGLOU received at least $17,138,637 in wired payments from COMPANY A in exchange for, among other things, transporting and selling catalytic converters (including stolen catalytic converters) to COMPANY A in New Jersey.

(All in violation of Title 18, United States Code, Section 371.)

### COUNT FOUR
(Operating an Unlicensed Money Transmission Business)

63.     The factual allegations contained in the Introduction are re-alleged and incorporated as if set forth herein in their entirety.

64.     On a date unknown, but at least as early as April 20, 2021, and continuing until at least on or about June 2, 2021, within the Eastern District of Virginia and elsewhere, the defendant, THEODORE NICHOLAS PAPOULOGLOU, a/k/a "NICK PAPOULOGLOU," a/k/a "NICK EMPORIA," defendant herein, did knowingly and intentionally conduct, control, manage, supervise, direct, and own an unlicensed money transmitting business affecting interstate and foreign commerce that: (1) operated without an appropriate money transmitting license in Virginia, where such operation is punishable as a misdemeanor under state law, whether or not the defendant knew that the operation was required to be licensed and that the operation was so punishable; and (2) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and the regulations thereunder.

65.     On multiple occasions, PAPOULOGLOU's co-conspirators, including CC-3, CC-4, and CC-5, transported catalytic converters to COMPANY A in New Jersey for sale. On numerous occasions, COMPANY A utilized PAPOULOGLOU and the Catalytic Converter Businesses to facilitate COMPANY A's payment to the co-conspirators for catalytic converters, via the following arrangements: (1) COMPANY A sent the Catalytic Converter Businesses and PAPOULOGLOU wire transfers of funds constituting payments for the catalytic converters received from co-conspirators; (2) PAPOULOGLOU paid a bulk cash delivery service to withdraw money from the Catalytic Converter Business accounts and deliver bulk cash to PAPOULOGLOU in Emporia, Virginia, within the Eastern District of Virginia; and (3) PAPOULOGLOU thereafter arranged for the delivery of bulk cash to the co-conspirators, often taking a fee for himself for the transaction.

66.     The total value of the funds that PAPOULOGLOU illicitly transferred was at least approximately $6,649,313.

67.     As part these transactions, PAPOULOGLOU knowingly transmitted and caused to be transmitted electronic wirings in interstate commerce, including in the Eastern District of Virginia.

### A.  April 20, 2021 Transmission

68.     As an illustrative example, at some point before April 20, 2021, CC-3 sold catalytic converters to COMPANY A.

69.     Thereafter, on or about April 20, 2021, CC-1 sent a $450,000 wire transfer from COMPANY A's bank account at Valley National Bank (account number ending in 1383) (the "Valley-1383 Account") to PAPOULOGLOU's BB&T-0930 Account. The purpose of COMPANY A's wire transfer to PAPOULOGLOU was for PAPOULOGLOU to, in turn, transmit the funds to CC-3.

70.     The same day, on or about April 20, 2021, PAPOULOGLOU wired $450,000 between his Catalytic Converter Business accounts – *i.e.*, from his BB&T-0930 Account to his BB&T-9445 Account.  On or about April 22, 2021, Garda Technical Services withdrew $450,000 from the BB&T-9445 Account and delivered that $450,000 in cash to PAPOULOGLOU in Emporia, Virginia.

71.     On April 20, 2021, CC-1 also sent a $98,991 wire transfer from the COMPANY A bank account, that is, the Valley-1383 Account, to PAPOULOGLOU's BB&T-0930 Account. The same day, PAPOULOGLOU wired $95,000 between his Catalytic Converter Business accounts – *i.e.*, from his BB&T-0930 Account to his BB&T-9445 Account. On April 26, 2022, PAPOULOGLOU withdrew $99,000 via cashier's checks written to cash from the BB&T-9445 Account, comprising PAPOULOGLOU's fee for facilitating the $450,000 financial transaction.

72.     CC-3 arrived in Emporia, Virginia on April 21, 2021 to pick up the bulk cash from PAPOULOGLOU. CC-3 left Emporia, Virginia with the cash on or about April 22, 2021.

### B. May 12, 2021 Transmission

73.     As an illustrative example, at some point before May 11, 2021, CC-3 sold catalytic converters to COMPANY A.

74.     Thereafter, on or about May 11, 2021, CC-1 sent a $900,000 wire transfer from COMPANY A's bank account, that is, the Valley-1383 Account, to PAPOULOGLOU's BB&T-0930 Account. The purpose of COMPANY A's wire transfer to PAPOULOGLOU was for PAPOULOGLOU to, in turn, transmit the funds to CC-3.

75.     The same day, on or about May 11, 2021, PAPOULOGLOU wired $900,000 between his Catalytic Converter Business accounts – i.e., from his BB&T-0930 Account to his BB&T-9445 Account. On or about May 11, 2021, Garda Technical Services withdrew $900,000 from the BB&T-9445 Account and delivered that $900,000 in cash to PAPOULOGLOU in Emporia, Virginia.

76.     Thereafter, on or about May 12, 2021, PAPOULOGLOU transmitted bulk cash in the amount of $800,000 to CC-3, keeping for himself a portion of the bulk cash received from CC-1 as PAPOULOGLOU's fee for facilitating the transaction. On or about May 12, 2021, PAPOULOGLOU generated an invoice for "Cash" in the amount of $800,000, reflecting that DG Auto South had transmitted $800,000 in cash to CC-3 on or about May 12, 2021. The invoice balance reflected $0. CC-3 picked up the cash from Emporia, Virginia.

### C. May 14, 2021 Transmission

77.     As an illustrative example, at some point before May 13, 2021, CC-5 sold catalytic converters to COMPANY A.

78.     Thereafter, on or about May 13, 2021, CC-1 sent a $600,000 wire transfer from COMPANY A's bank account, that is, the Valley-1383 Account, to PAPOULOGLOU's BB&T-0930 Account. The purpose of COMPANY A's wire transfer to PAPOULOGLOU was for PAPOULOGLOU to, in turn, transmit the funds to CC-5.

79.     The same day, on or about May 13, 2021, PAPOULOGLOU wired $599,000 between his Catalytic Converter Business accounts – *i.e.*, from his BB&T-0930 Account to his BB&T-9445 Account. On or about May 13, 2021, Garda Technical Services withdrew $600,000 from the BB&T-9445 Account and delivered that $600,000 in cash to PAPOULOGLOU in Emporia, Virginia.

80.     Thereafter, on or about May 14, 2021, PAPOULOGLOU transmitted bulk cash in the amount of $500,000 to CC-5, keeping for himself a portion of the bulk cash received from CC-1 as PAPOULOGLOU's fee for facilitating the transaction. On or about May 14, 2021, PAPOULOGLOU generated an invoice for "cash" in the amount of $500,000, reflecting that DG Auto South had transmitted $500,000 in cash to CC-5 on or about May 14, 2021. The invoice balance reflected $0. CC-5 picked up the cash from Emporia, Virginia.

### D.  June 2, 2021 Transmission

81.     As an illustrative example, at some point before June 1, 2021, CC-3 sold catalytic converters to COMPANY A.

82.     On or about June 1, 2021, to pay CC-3, CC-1 sent a $900,000 wire transfer from COMPANY A's bank account, that is, the Valley-1383 Account, to PAPOULOGLOU's BB&T-0930 Account. The purpose of COMPANY A's wire transfer to PAPOULOGLOU was for PAPOULOGLOU to, in turn, transmit the funds to CC-3.

83.     The same day, on or about June 1, 2021, PAPOULOGLOU wired $900,000 between his Catalytic Converter Business accounts – *i.e.*, from his BB&T-0930 Account to his BB&T-9445 Account.  On or about June 1, 2021, Garda Technical Services withdrew $900,000 from the BB&T-9445 Account and delivered $900,000 in cash to PAPOULOGLOU in Emporia, Virginia.

84.     Thereafter, on or about June 2, 2021, PAPOULOGLOU transmitted bulk cash in the amount of $659,313.00 to CC-3, keeping for himself a portion of the bulk cash received from CC-1 as PAPOULOGLOU's fee for facilitating the transaction. On or about June 2, 2021, PAPOULOGLOU generated an invoice for "cash" in the amount of $659,313.00, reflecting that PAPOULOGLOU and DG Auto South had transmitted $659,313.00 in cash to CC-3 on or about June 2, 2021. The invoice balance reflected $0. CC-4 signed the invoice for the cash recipients. CC-3 picked up the cash from Emporia, Virginia.

(All in violation of Title 18, United States Code, Sections 1960(a), 1960(b)(1)(A), and 1960(b)(1)(B).)

### FORFEITURE ALLEGATION

Pursuant to 32.2 of the Federal Rules of Criminal Procedure, the defendant is hereby notified that, upon conviction of Count Four of this Indictment, the defendant shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1).

Property subject to forfeiture includes, but is not limited to: The sum of at least $2,850,000, representing the property involved in the offense and which sum shall be reduced to a money judgment against the defendant in favor of the United States.

If any property subject to forfeiture cannot be located, the United States will seek an order

forfeiting substitute assets.

(All in accordance with Title 18, United States Code, Section 982(a)(1); Title 21, United States
Code, Section 853(p); and Title 26, United States Code, Section 7301 and Title 28, United States
Code, Section 2461.)

A TRUE BILL:

JESSICA D. ABER
UNITED STATES ATTORNEY

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office

By: _____

Avi Panth
Kashan K. Pathan
Assistant United States Attorneys

22